IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAID AHMED HASSAN,<br><br>    Petitioner,<br> vs.<br><br>D. K. SISTO, Warden,<br><br>    Respondent. | No. C 08-5576 LHK (PR)<br><br>ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY |

Petitioner, a state prisoner proceeding *pro se*, filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his state conviction. The Court found the amended petition, (Docket No. 3), stated cognizable claims, and ordered Respondent to show cause why the amended petition should not be granted on June 14, 2010.[1]  Respondent filed an answer addressing the merits of the petition. (Docket No. 22 ("Ans.").) Petitioner filed a traverse. (Docket No. 23.) Having reviewed the briefs and the underlying record, the Court concludes that Petitioner is not entitled to relief based on the claims presented and denies the petition.

**PROCEDURAL HISTORY**

In 2006, an Alameda County jury convicted Petitioner of second-degree robbery with an

---

[1] Thereafter, the matter was reassigned to this Court on August 2, 2010.

Order Denying Petition for Writ of Habeas Corpus; Denying COA
Hassan5576hcden.hhl.wpd

associated enhancement for personal use of a knife in the commission of the offense. With another enhancement for a prior "strike" conviction, he was sentenced to sixteen years in prison. On direct appeal the California Court of Appeal reversed and vacated the one-year enhancement for personal use of a knife and otherwise affirmed. The California Supreme Court denied review. Petitioner also filed a state habeas petition in the state high court which was denied.

## BACKGROUND[2]

On the afternoon of August 25, 2005, defendant drove a van owned by his brother to a liquor store on Foothill Boulevard in Oakland, where he encountered his friend Esmir, who lived in the neighborhood. [FN2] Defendant bought a beer at the liquor store and unsuccessfully attempted to obtain "change" from Esmir and others in the area. He then told Esmir that he "needed money." Esmir advised defendant that he had none, whereupon defendant asked Esmir if he "wanted to ride with him." Esmir agreed, but before he entered the van he retrieved a yellow-handled fishing knife he kept for protection under a nearby door. When Esmir got into the front passenger seat of the van he showed the knife to defendant and placed it on the floor between the driver and passenger seats.

> FN2. Esmir was a minor at the time the offenses were committed, so we will refer to him by his first name only.

Defendant drove the van to 35th Avenue and Allendale, where he parked behind Rene's Oriental Market. He said, "I'm about to rob the store," and asked Esmir for the knife. Defendant was "laughing," so Esmir thought perhaps he was "not really serious about it." Esmir handed defendant the knife. Defendant then went into the store while Esmir waited in the van.

Esmir became concerned that defendant was "really thinking he was going to rob the store." He moved to the driver's seat, started the van, and made a U-turn to "get out of there."

Meanwhile, defendant, dressed entirely in black and wearing a black beanie, was inside Rene's Oriental Market, where he asked the cashier, Omer Alguhem, if he sold beer and wine. When Alguhem said no, defendant immediately left the store.

As Esmir turned the van around, defendant appeared in the street and angrily told Esmir to return to "the same spot" he had parked before. Esmir made another U-turn and parked where defendant directed. From inside the store, Alguhem observed a van with a broken rear window covered by cardboard make a U-turn on Allendale and park. Esmir remained in the

---

[2] The facts of this case are taken from the California Court of Appeal opinion in *People v. Hassan*, No. A115219 (Cal. App. 1 Dist. Oct. 4, 2007). (Ans. Ex. C5 ("Op").)

driver's seat of the van.

According to Alguhem, two or three minutes after defendant left the store, he returned with an African-American man. The two men approached Alguhem and ordered him to the floor. Defendant stood directly in front of Alguhem. From about two feet away, defendant held a silver gun in front of the victim's face and warned him, "Don't' look at me or I'll shoot." Alguhem feared for his life. He laid on the floor behind the cash register with his face toward Allendale Street. Defendant took bills and rolls of quarters in the amount of $400 and $500 from the cash register. The other man did not speak, but held a gold-colored gun on Alguhem.

Defendant returned to the van and ordered Esmir to "go." Esmir testified that he did not then see his knife in defendant's possession.

Two or three minutes after the two men left the store, Alguhem got up from the floor and called the police. He gave a description of the robbers and the van, and stated that the van drove away from the store east on Allendale.

Police officers arrived at the store within three minutes. Alguhem "told them what happened," and the officers "made some calls." Alguhem described the two suspects for the police: one was a "male Black, approximately six foot, muscular build, wearing a white T-shirt and blue jeans;" the other was a "male Hispanic, thin, approximately five foot seven, wearing a black T-shirt, black beanie, and blue jeans." Both were "carrying revolvers; one gold and one silver."

As directed by defendant from the front passenger seat, Esmir drove the van away from Rene's Oriental Market to a gas station on High Street near Fremont High School. When they got out of the van defendant showed Esmir a wad of bills that he counted. Esmir also thought he saw defendant put the knife in the back of the van after they reached the gas station on High Street. Defendant told Esmir that he "robbed the liquor store." They bought gas, cigarettes and a soft drink, and defendant gave Esmir a total of $29 in bills. Defendant placed the remainder of the money in a "glove compartment" between the passenger and driver seats.

From the gas station, Esmir drove the van to Foothill Boulevard and Fairfax Avenue in Oakland, where defendant told Esmir to stop at Isaacs liquor store. Thinking defendant was "going to rob it," Esmir declined to stop. Instead, he drove on to Bancroft Avenue, where defendant directed him to park in front of a house. Defendant went to the front door and talked to "some Mexican guy" with long hair. They carried on an animated conversation for about two minutes, then shook hands before defendant returned to the van.

From there, Esmir drove the van on Bancroft to 73rd Avenue, where they were detained by the police in a parking lot at Church's Chicken. Before Esmir left the van as ordered by the police, defendant told him, "Don't say nothing." Esmir and defendant were apprehended and placed in handcuffs.

Alguhem was transported to the detention scene to "look at" some "possible suspects" on Bancroft Avenue. Alguhem was advised that the police would "bring out the suspects one by one." He was also told to "keep an open mind," and "that it may or may not be the suspect." Alguhem first looked at Esmir and said, "I never saw him." He then "took a good look" at defendant

>   and said, "yeah, that's the guy who robbed me." He was specific and positive of his identification of defendant.
>   An ensuing search of the van resulted in seizure of a knife of 14 and one-half inches in length inside of gold sheath found on the floorboard between the driver and passenger seats, along with two rolls of coins and paper currency in the amount of $171 in the center console. Cash in the amount of $18 was seized from defendant;'$39 was seized from Esmir.
>
>   After his arrest, Esmir received two telephone calls from professed friends of defendant during which he was advised not to "say anything" and "not to come to court." Esmir's father intercepted a letter sent to Esmir from "Said and last name Ahmed" which told him not to "worry," and that someone would "contact him." The last line of the letter stated "what's going to happen" with "the snitches in our hood." Esmir's father became "very angry" when he read the letter, and threw it away without showing it to his son.

(Op. at 2-5.)

## DISCUSSION

A.  <u>Standard of Review</u>

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a state court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).  The first prong applies both to questions of law and to mixed questions of law and fact, *Williams v. Taylor*, 529 U.S. 362, 384-86 (2000), while the second prong applies to decisions based on factual determinations, *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412-13. A state court decision is an

"unreasonable application of" Supreme Court authority, falling under the second clause of § 2254(d)(1), if the state court correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.  The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411.

In determining whether the state court's decision is contrary to, or involved an unreasonable application of, clearly established federal law, a federal court looks to the decision of the highest state court to address the merits of a Petitioner's claim in a reasoned decision. *LaJoie v. Thompson*, 217 F.3d 663, 669 n.7 (9th Cir. 2000).  Here, that decision is the opinion of the California Court of Appeal.

B.     Petitioner's Claims

As grounds for federal habeas relief, Petitioner claims the following: (1) he received ineffective assistance of counsel for several errors, and that counsel had a conflict of interest with Petitioner; (2) the California Court of Appeal violated his right to due process; (3) his constitutional right to a speedy trial was violated; (4) the trial court erred in imposing the upper term without submitting the aggravating factors to a jury, violating Petitioner's right to a jury trial[3]; and (5) the use of a prior plea from 2001 was unconstitutional because it violated his plea agreement.

1.     Ineffective Assistance of Counsel

Petitioner first claims that trial counsel rendered ineffective assistance due to the following errors: (a) failure to file a motion to suppress evidence obtained by an allegedly unlawful search; (b) failure to assert an alibi defense; and (c) failure to investigate the prior conviction.  Petitioner also asserts that there was a conflict of interest.

In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, petitioner

---

[3] Petitioner included this claim in his petition, which the Court did not list in its Order to Show Cause.  Respondent having answered on this claim, the Court will herein review it on the merits.

must establish two things.  First, he must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984).  Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.  A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.*

It is unnecessary for a federal court considering a habeas ineffective assistance claim to address the prejudice prong of the *Strickland* test if the petitioner cannot even establish incompetence under the first prong. *See Siripongs v. Calderon*, 133 F.3d 732, 737 (9th Cir. 1998).

        a.      <u>Failure to file motion to suppress</u>

Petitioner first claims that counsel was deficient because he failed to file a motion to suppress evidence that was seized during a warrantless search.  Respondent argues that there was no basis for such a motion as the search was lawful as incident to an arrest "following a vehicle stop pursuant to probable cause confirmed by the [victim's] field identification." (Ans. at 5.)

According to the evidence presented at trial, a detailed description of Petitioner and Esmir was broadcast within minutes of the robbery at Rene's Oriental Market, which took place around 4:30 p.m., on August 25, 2005.  (Report's Transcript ("RT") at 58-60, 71-72, 355-56, 371; Resp't Ex. B.)  The police spotted a van matching the description, which included a cardboard over its rear passenger window, and stopped it at 4:40 p.m.  (*Id.* at 403-06, 416-18.)  The police detained Petitioner and Esmir while the store owner was brought to the scene, where he made a positive identification of Petitioner.  (*Id.* at 72-73, 94, 99, 362, 380-81.)  The police then searched the van and found a knife and most of the money in the denominations taken from the cash register, including rolls of coins which the owner had just rolled by hand.  (*Id.* at 408-410.)

Based on such evidence, the Court agrees with Respondent that there was no basis for counsel to attack the seized evidence.  The police had probable cause to stop and detain

1  Petitioner as his van matched the description of the vehicle involved with a robbery that occurred
2  just minutes before. Furthermore, the police did not arrest Petitioner until the store owner made
3  a positive identification of Petitioner, at which point they proceeded to make an authorized
4  search of the van incident to the arrest. A lawyer need not file a motion that he knows to be
5  meritless on the facts and the law, or put simply, trial counsel cannot have been ineffective for
6  failing to raise a meritless motion. *Juan H. v. Allen*, 408 F.3d 1262, 1273 (9th Cir. 2005); *Rupe
7  v. Wood*, 93 F.3d 1434, 1445 (9th Cir. 1996); *see, e.g.*, *Lowry v. Lewis*, 21 F.3d 344, 346 (9th
8  Cir.), *cert. denied*, 513 U.S. 1001 (1994) (failure to file suppression motion not ineffective
9  assistance where counsel investigated filing motion and no reasonable possibility evidence
10 would have been suppressed). Accordingly, this claim is without merit.

b.  Failure to raise alibi defense

12 Petitioner's second claim with respect to trial counsel's performance is that he failed to
13 assert an alibi defense. As discussed above, Petitioner was detained in the van that matched the
14 description of the vehicle involved in the robbery that occurred just minutes before. *See supra* at
15 6. The store owner positively identified Petitioner as the man who robbed him. *Id.* Petitioner
16 had in his possession the hand-wrapped rolls of coins and the small denomination bills that were
17 taken from the cash register. *Id.* Respondent also points out that Petitioner was able to purchase
18 gas nearby shortly after the robbery when earlier in the day he needed to borrow money to buy
19 beer. (Ans. at 6.) Lastly, Petitioner's own friend Esmir described Petitioner's participation in
20 the robbery. *See supra* at 2-3. As Respondent puts it, Petitioner was caught "red-handed" and
21 there was no possibility of an alibi defense. (Ans. at 6.)

22 Petitioner puts forth no evidence to support a viable alibi defense, *e.g.*, an alibi witness
23 who would have been available to testify at trial and what testimony they would have presented
24 to support such a defense. In light of the overwhelming direct evidence linking Petitioner to the
25 crime, and no evidence to the contrary, the Court is not persuaded that counsel rendered
26 ineffective assistance in failing to investigate and present an alibi defense. The United States
27 Supreme Court has never required defense counsel to pursue every nonfrivolous claim or
28 defense, regardless of its merit, viability, or realistic chance of success. *Knowles v. Mirzayance*,

129 S. Ct. 1411, 1420, 1421-22 (2009). Thus counsel's abandoning a defense that has "almost no chance of success" is reasonable, even if there is "nothing to lose" by preserving the defense. *Id.* at 1419-20. This claim is without merit.

### c.     Failure to oppose prior conviction

Petitioner's third claim is that counsel rendered ineffective assistance for failing to oppose Petitioner's prior conviction for gross vehicular manslaughter not involving alcohol as a strike and for not discouraging Petitioner from admitting it. Respondent contends that the fact of the prior conviction was admitted to keep that fact away from the jury, and that it would have been proved a strike whether Petitioner admitted it or put it before the jury. (Ans. at 6.)

According to Respondent, the prior conviction for gross vehicular manslaughter counts as a strike whether or not it involves alcohol: "Whether specifically listed in California Penal Code section 1192.7(c) or not, any felony is a serious felony, per subdivision (c)(8), if the defendant personally inflicts great bodily injury on any person, other than an accomplice." (Ans. at 6, citing *People v. Gonzales,* 29 Cal.App.4th 1684, 1690-91 (1994).) Vehicular manslaughter, whether alcohol was involved or not, will enhance a new sentence as a strike because of the death of the victim. (*Id.*) Petitioner fails to present evidence to the contrary. Accordingly, it cannot be said that counsel was remiss in failing to challenge the use of the prior as a strike, especially when the alternative would have been presenting the fact of the prior conviction to the jury and risking its prejudicial effect in determining whether Petitioner was responsible for the current offense. Petitioner fails to show that counsel rendered deficient performance in this regard.

### d.     Conflict of interest

Separately, Petitioner asserts that counsel "acted as though he no longer had to meet his client's requests for particular [information] and investigation affecting the adequacy of counsel's representation." (Pet. at 5.) The Court liberally construed this claim as a conflict of interest between Petitioner and trial counsel.

The Sixth Amendment's right to conflict-free counsel is violated only if the conflict "adversely affected" trial counsel's performance. *Alberni v. McDaniel*, 458 F.3d 860, 870 (9th

Cir. 2006). "[A]n actual conflict of interest mean[s] precisely a conflict that affected counsel's performance – as opposed to a mere theoretical division of loyalties." *Mickens v. Taylor*, 535 U.S. 162, 171 (2002) (emphasis omitted). An "actual conflict of interest" only occurs when counsel "actively represented conflicting interests." *Strickland*, 466 U.S. at 692. A theoretical or potential conflict is insufficient to constitute actual conflict; instead counsel must have actively represented conflicting interests. *Bragg v. Galaza*, 242 F.3d 1082, 1087 (9th Cir.), *amended*, 253 F.3d 1150 (9th Cir. 2001); *Morris v. California*, 966 F.2d 448, 455 (9th Cir. 1991). The term "actual conflict" is not a synonym for "direct conflict." *United States v. Rodrigues*, 347 F.3d 818, 823-24 (9th Cir. 2003). A petitioner must prove an actual conflict through a factual showing in the record. *Bragg*, 242 F.3d at 1087; *Morris*, 966 F.2d at 455.

In order to establish that a conflict of interest "adversely affected counsel's performance," petitioner need only show "that some effect on counsel's handling of particular aspects of the trial was 'likely.'" *United States v. Miskinis*, 966 F.2d 1263, 1268 (9th Cir. 1992) (citing *Mannhalt v. Reed*, 847 F.2d 576, 583 (9th Cir.), *cert. denied*, 488 U.S. 908 (1988); *see Lockhart v. Terhune*, 250 F.3d 1223, 1231 (9th Cir. 2001) (same); *Del Muro*, 87 F.3d at 1080 (same); *Sanders*, 21 F.3d at 1452 (reviewing court "must examine the record to discern whether the attorney's behavior seems to have been influenced by the suggested conduct"). *But see Bragg*, 242 F.3d at 1087 (petitioner must demonstrate that conflict of interest "actually affected" the attorney's performance). This showing need not rise to the level of actual prejudice, as it must with an ineffective assistance claim based on counsel's incompetence. *Maiden v. Bunnell*, 35 F.3d 477, 481 (9th Cir. 1994); *Miskinis*, 966 F.2d at 1268.

The points of "conflict" between Petitioner and his trial counsel was over trial strategy, *e.g.*, whether to present an alibi defense when Petitioner was caught red-handed, whether to make a big point in front of the jury about minor inconsistencies in witness testimony, and whether to solidify the eyewitness identification testimony by having a line-up between the field identification and the preliminary hearing. Respondent contends that these issues are not representations of conflicting interests as both Petitioner and counsel were acting solely for Petitioner's benefit; the main disagreement was over strategy. (Ans. at 8.)

1    There is nothing in the record to indicate that counsel actively represented any interests
2 other than that of Petitioner, particularly as counsel did not represent any other defendant in the
3 trial. Nor has Petitioner pointed to any evidence indicating that a conflict "adversely affected
4 counsel's performance" or that it was "likely" that any conflict had an effect on counsel's
5 handling of Petitioner's defense. *Miskinis,* 966 F.2d at 1268. The "conflict" between Petitioner
6 and counsel involved defense strategy, and as discussed above, Petitioner's preferred strategies
7 were meritless and without basis. Petitioner has presented no evidence to show that counsel was
8 representing conflicting interests, or that he had any personal interest in the outcome of the case
9 which was likely to have affected his performance. Accordingly, this claim is without merit.

   2.    Due Process

Petitioner claims that the California Court of Appeal improperly refused to accept his pleading on appeal. It is undisputed that on appeal, Petitioner was represented by counsel who filed an opening brief and a supplemental brief. Petitioner then attempted to personally file a separate supplemental pleading which the Court of Appeal refused to file because Petitioner was represented by counsel. Petitioner claims this resulted in a denial of his right to due process.

In *In re Said A. Hassan*, case number A119326, the state appellate court denied the request to supplement his appeal with another petition by citing *People v. Clark* (2002) 3 Cal.4th 41, 173. (Ans. Ex. E2.) The California Supreme Court described the rule therein as follows:

> In addition to the briefing of counsel, defendant has filed briefs and other documents in propria persona. In *People v. Mattson*, (1959) 51 Cal.2d 777 [336 P.2d 937], we confronted a similar situation. As we there observed, "although defendant has been diligently represented by court-appointed counsel, he has persisted in presenting documents in propria persona which reflect his misconceptions of and refusal to accept established rules of law." (*Id.* at pp. 797-798.) We held: "The general rule that a defendant who is represented by an attorney of record will not be personally recognized by the court in the conduct of his case applies to the filing of pro se documents on appeal. Because of the undesirability of fruitlessly adding to the burdens of this court the time-consuming task of reading pro se documents which are not properly before us, and, if they be read, of consequently enlarging this opinion by a recountal and discussion of the contentions made in propria persona, such documents filed in this appeal by defendant should be stricken." (*Id.* at 798, citations omitted.)
>
> We now reiterate this rule. Motions and briefs of parties represented by counsel must be filed by such counsel. (See also *In re Cathey* (1961) 55 Cal.2d 679, 684-685 [12 Cal.Rptr. 762, 361 P.2d 426] [where we accepted pro se documents filed before the appointment of counsel and "briefs subsequently prepared by

> [defendant] personally but filed on his behalf by his counsel."].) Developments since *Mattson* (*supra*, 51 Cal.2d 777) was decided necessitate one exception to this rule. We will accept and consider pro se motions regarding representation, including requests for new counsel. (Cf. *People v. Marsden*, *supra*, 2 Cal.3d 118.) Such motions must be clearly labeled as such, and must be limited to matters concerning representation. We will not consider extraneous matters even in such documents unless submitted by counsel. Any pro se documents by represented parties not clearly coming within this exception will be returned unfiled.

(Ans. at 8-9, citing *People v. Clark,* 3 Cal.4th 41 (2002).)

The Constitution does not require states to grant appeals as of right to criminal defendants seeking to review alleged trial court errors. *See Evitts v. Lucey*, 469 U.S. 387, 393 (1985) (citation omitted). However, if a state creates a system for appellate review, the procedures must comport with the demands of constitutional due process and equal protection. *See id.*

Here, there is nothing to suggest that the state court's rule in *People v. Clark* violated Petitioner's right to due process, especially as it appeared that he was adequately being represented by counsel. Furthermore, Petitioner was not foreclosed from presenting his claims in a separate state habeas action. Lastly, Petitioner's argument that the Court of Appeal's refusal to file his supplemental pleading was "based on an unreasonable determination of the facts and evidence," (Pet. at 11), is an inappropriate application of AEDPA. This AEDPA standard applies when reviewing a state court's adjudication on the merits of a habeas claim, not its decisions with respect to state filing procedures. Accordingly, this claim is without merit.

### 3. Right to a Speedy Trial

Petitioner claims that his right to a speedy trial was violated because he was not brought to trial within 60 days of his arraignment. Specifically, he claims that a hearing was unlawfully put off to a Monday when the 60th day after arraignment in a non-time waiver case occurred on a weekend. (Pet. Ex. C at 16.)

A speedy trial is a fundamental right guaranteed the accused by the Sixth Amendment to the Constitution and imposed by the Due Process Clause of the Fourteenth Amendment on the states. *Klopfer v. North Carolina*, 386 U.S. 213, 223 (1967). No per se rule has been devised to

determine whether the right to a speedy trial has been violated. Instead, courts must apply a flexible "functional analysis," *Barker v. Wingo*, 407 U.S. 514, 522 (1972), and consider and weigh the following factors in evaluating a Sixth Amendment speedy trial claim: (1) length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his right; and (4) prejudice to the defendant. *Doggett v. United States*, 505 U.S. 647, 651 (1992); *Barker*, 407 U.S. at 530; *United States v. Lam*, 251 F.3d 852, 855 (9th Cir.), *amended*, 262 F.3d 1033 (9th Cir. 2001). None of the four factors are either a necessary or sufficient condition for finding a speedy trial deprivation. *Barker*, 407 U.S. at 533. They are related factors and must be considered together with such other circumstances as may be relevant. *Id.* The Ninth Circuit considers the second factor, i.e., the reason for the delay, the "focal inquiry." *United States v. King*, 483 F.3d 969, 976 (9th Cir. 2007) (citing *United States v. Sears, Roebuck & Co.*, 877 F.2d 734, 739-40 (9th Cir. 1989)). The length of the delay is to some extent a triggering mechanism. Unless it is long enough to be considered "presumptively prejudicial," there is no necessity for inquiry into the other factors. *Doggett*, 505 U.S. at 651-52.

Here, a delay over a weekend is hardly long enough to be considered "presumptively prejudicial" to necessitate an inquiry into the other factors. *Id.* Even so, it is clear that the reason for the "delay" was to comport with normal court days which caused no prejudice to Petitioner. *Barker*, 407 U.S. at 530. Accordingly, Petitioner has failed to show that his right to a speedy trial was violated under these circumstances.

4. <u>Use of Prior Conviction</u>

Petitioner claims that the imposition of an upper term violated his right to a jury trial under *Blakely v.* Washington, 542 U.S. 296 (2004) and *Cunningham v. California*, 549 U.S. 270 (2007). The trial court imposed an upper term on the robbery count which Petitioner alleges was based on findings of aggravating factors - that Petitioner persuaded a minor to participate in the crime, he threatened the minor with harm if he testified, and his violent conduct demonstrated he is a danger to the community - which were not found to be true beyond a reasonable doubt by a jury.

The Court of Appeal summarized the relevant changes in state law following *Blakely*.

Order Denying Petition for Writ of Habeas Corpus; Denying COA
Hassan5576hcden.hhl.wpd
12

> In *Blakely*, the United States Supreme Court revisited the rule articulated in *Apprendi v. New Jersey* (2000) 530 U.S. 466, 490 (*Apprendi*), that "'[o]*ther than the fact of a prior conviction*, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.'" (*Blakely*, supra, 542 U.S. 296, 301, italics added.) The court found that an exceptional sentence beyond the standard range sentence for the offense imposed by a trial judge under Washington's determinate sentencing based upon several specified facts found by the trial judge violated the *Apprendi* rule that the jury verdict alone must "authorize the sentence." (*Blakely*, supra, at p. 305, fn. 8; see also *People v. Riskin* (2006) 143 Cal.App.4th 234, 241; *People v. Linder* (2006) 139 Cal.App.4th 75, 83-84.)
>
> The California Determinate Sentencing Law (DSL) was temporarily spared from the reach of *Blakely* by the decision in *People v. Black* (2005) 35 Cal.4th 1238 (*Black I*), where the California Supreme Court decided that a "defendant's constitutional right to a jury trial" is "not violated by the trial court's imposition of the upper term sentence" for a conviction "or by its imposition of consecutive sentences" upon two or more convictions. (*Id.* at p. 1264.)  After defendant submitted his opening brief, however, in *Cunningham*, supra, 166 L.Ed.2d 856 the United States Supreme Court examined the California determinate sentencing law in light of *Blakely*. The court in *Cunningham* disagreed with the *Black I* decision, and concluded: "In accord with *Blakely*, therefore, the middle term prescribed in California's statutes, not the upper term, is the relevant statutory maximum. [*Blakely*, supra, 542 U.S. 296, 303 ('[T]he '"statutory maximum" for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.*' (Emphasis in original.).).] Because circumstances in aggravation are found by the judge, not the jury, and need only be established by a preponderance of the evidence, not beyond a reasonable doubt, [citation], the DSL violates *Apprendi's* bright-line rule: Except for a prior conviction, 'any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.' [*Apprendi*, supra, 530 U.S. 466, 490.]" (*Cunningham*, supra, 166 L.Ed.2d 856, 873.) The court summarized: "Contrary to the *Black* court's holding, our decisions from *Apprendi* to *Booker* point to the middle term specified in California's statutes, not the upper term, as the relevant statutory maximum. Because the DSL authorizes the judge, not the jury, to find the facts permitting an upper term sentence, the system cannot withstand measurement against our Sixth Amendment precedent." (*Cunningham*, supra, at p. 876.)

(Op. at 9-10.)

The Court of Appeal ultimately rejected this claim, finding that Petitioner's prior conviction made him eligible for the upper term notwithstanding the trial court's improper use of aggravating factors.

> Again, recent pronouncements by the California Supreme Court are determinative on this issue. The court in *Sandoval* observed that the "United States Supreme Court has recognized two exceptions to a defendant's Sixth Amendment right to a jury trial on an aggravating fact that renders him or her eligible for a sentence above the statutory maximum. First, a fact admitted by the defendant may be used to increase his or her sentence beyond the maximum authorized by the jury's

verdict. [Citation.] Second, the right to a jury trial and the requirement of proof beyond a reasonable doubt do not apply to the aggravating fact of a prior conviction." (*Sandoval*, *supra*, 41 Cal.4th 825, 836-837.) In *People v. Black* (2007) 41 Cal.4th 799 (*Black II)*, the court declared that "as long as a single aggravating circumstance that renders a defendant eligible for the upper term sentence has been established in accordance with the requirements of *Apprendi* and its progeny, any additional factfinding engaged in by the trial court in selecting the appropriate sentence among the three available options does not violate the defendant's right to jury trial. (*Id.*, at p. 812, italics omitted.) The court added: "Under California's determinate sentencing system, the existence of a single aggravating circumstance is legally sufficient to make the defendant eligible for the upper term. [Citation.] Therefore, if one aggravating circumstance has been established in accordance with the constitutional requirements set forth in *Blakely*, the defendant is not 'legally entitled' to the middle term sentence, and the upper term sentence is the 'statutory maximum.'" (*Id.*, at p. 813.) From this premise the court reasoned: "It follows that imposition of the upper term does not infringe upon the defendant's constitutional right to jury trial so long as one legally sufficient aggravating circumstance has been found to exist by the jury, has been admitted by the defendant, or is *justified based upon the defendant's record of prior convictions*." (*Id.*, at p. 816, italics added.)

Moreover, the court in *Black II* decided that the prior conviction exception to the right to a jury trial extends to any aggravating circumstance related to the "defendant's criminal history" or recidivism "that may be determined by examining the records of the prior convictions." (*Black II*, *supra*, 41 Cal.4th 799, 818, 819.) Prior convictions listed in the probation report that were both numerous and of increasing seriousness were also found legally sufficient by the court in *Black II* to render the defendant eligible for the upper term sentence as an aggravating circumstance without violation of the right to a jury trial under *Blakely*. (*Ibid.*) Here, as in *Black II*, defendant's record of prior convictions, although not expressly mentioned by the trial court in support of the sentence choice, justified the selection of the upper term as the statutory maximum sentence. Thus, despite improper reliance upon some aggravating circumstances by the trial court, we must follow the authority of the California Supreme Court's decision in *Black II* to find that imposition of the upper term did not infringe upon the defendant's constitutional right to jury trial. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455; *People v. Sullivan* (2007) 151 Cal.App.4th 524, 563; *People v. Scott* (2000) 85 Cal.App.4th 905, 915-916.)

(Op. at 10-12.)

The state appellate court's decision is not contrary to federal law. The "statutory maximum" for *Apprendi* purposes is the maximum sentence a judge could impose based solely on the facts reflected in the jury verdict or admitted by the defendant; that is, the relevant "statutory maximum" is not the sentence the judge could impose after finding additional facts, but rather is the maximum he or she could impose without any additional findings. *Blakely v.*

*Washington*, 542 U.S. 296, 303-04 (2004).[4] Here, Petitioner admitted the fact of his prior conviction as part of trial strategy. *See supra* at 7-8. Furthermore, recidivism and prior convictions increasing the maximum penalty need not be charged to comport with the constitutional right to fair notice because they are not considered an element of the offense charged. *See Almendarez-Torres v. United States*, 523 U.S. 224, 243-44 (1998). The Ninth Circuit has since held that *Almendarez-Torres* remains good law after *Apprendi* and provides that prior convictions, whether or not admitted by the defendant on the record, are sentencing factors rather than elements of the crime. *United States v. Pacheco-Zepeda*, 234 F.3d 411, 414-15 (9th Cir. 2001), *cert. denied*, 532 U.S. 966 (2001).[5] Here, the fact of Petitioner's prior conviction was an aggravating circumstance which made him eligible for the upper term, and a relevant sentencing factor under state law by which the trial court could impose the upper term without submitting additional facts to a jury. *Blakely*, 542 U.S. at 303-04. Accordingly, this claim has no merit.

        5.      <u>Prior Conviction Plea Agreement</u>

Petitioner claims that the use of the 2001 prior conviction to enhance his sentence on the current conviction violates the terms of the 2001 plea agreement. Specifically, Petitioner asserts that counting the prior conviction as a strike violates the "'specific promise'" of the 2001 plea agreement because he never explicitly agreed that the conviction could count as a future strike. (Pet. Ex. C at 30-31.)

A defendant must be advised of the range of allowable punishment that will result from his plea. *See Torrey v. Estelle*, 842 F.2d 234, 235 (9th Cir. 1988); *United States ex rel. Pebworth v. Conte*, 489 F.2d 266, 267 (9th Cir. 1974). But although a defendant is entitled to be informed

---

[4] *See e.g., Stokes v. Schriro*, 465 F.3d 397, 402-03 (9th Cir. 2006) (sentence imposed by disregarding jury's finding that offense was dangerous not *Apprendi* violation because sentence did not rely on any fact not found by jury).

[5] This is because unlike virtually any other consideration used to enlarge the possible penalty for an offense (*e.g.*, whether serious bodily injury results), prior convictions have been established through procedures satisfying the fair notice, reasonable doubt and jury trial guarantees. *See Jones v. United States*, 526 U.S. 227, 242-43 (1999).

1 of the direct consequences of the plea, the court need not advise him of "all possible collateral
2 consequences." *See Torrey*, 842 F.2d at 235; *United States v. Delgado-Ramos*, 635 F.3d 1237,
3 1239 (9th Cir. 2011) (per curiam) (citing *Torrey*, 842 F.2d at 235). Such a collateral
4 consequence includes the possibility of a sentence enhancement based on the guilty plea, *see*
5 *United States v. Garrett*, 680 F.2d 64, 65-66 (9th Cir. 1982), as is the case here. Furthermore,
6 there is no violation of due process where a trial court fails to inform a defendant of collateral
7 consequences, *see Torrey*, 842 F.2d at 236, nor where counsel fails to do so, *see id.* at 237
8 (failure to advise of collateral consequences cannot be held to be below objective standard of
9 reasonableness). Accordingly, there was no violation of Petitioner's plea agreement under these
10 circumstances.

## CONCLUSION

For the reasons set forth above, the petition for writ of habeas corpus is DENIED.

The federal rules governing habeas cases brought by state prisoners require a district court that denies a habeas petition to grant or deny a certificate of appealability ("COA") in its ruling. *See* Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254. Petitioner has not shown "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Accordingly, a COA is DENIED.

The Clerk shall close the file.

IT IS SO ORDERED.

DATED: 1/24/12

*Lucy H. Koh*
LUCY H. KOH
United States District Judge